UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER 617-352-9469 THAT IS STORED AT PREMISES CONTROLLED BY VERIZON WIRELESS | 21-MJ-6784-MPK<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, John Oliveira, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number 617-352-9469, ("the SUBJECT PHONE"), that is stored at premises controlled by Verizon Wireless, a cellular service provider headquartered at 180 Washington Valley Road, Bedminster, NJ 07921("Verizon").  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon to disclose to the government copies of the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a Police Officer with the Somerville Police Department and have been so employed since 1997.  In 2000, I was assigned to the Detective Bureau of the Somerville Police Department.  In June 2008, I was assigned to the FBI Boston Division's Violent Crimes Task Force ("VCTF"), which comprises law enforcement officers from the FBI, Massachusetts State

Police ("MSP"), and other local police departments. I have been sworn in as a Special Deputy U.S. Marshal. As a member of the VCTF, I am responsible for investigating kidnappings, murders, robberies, extortion, and other violent crimes. My investigations have included the use of surveillance techniques and the execution of search, seizure, and arrest warrants.

3. On December 16, 2021, this Court issued a complaint charging JOHN SCHURKO ("SCHURKO") with affecting commerce by robbery, in violation of 18 U.S.C. § 1951. A copy of the complaint, including the supporting affidavit ("Complaint Affidavit"), are attached hereto, and the facts set forth in the affidavit are hereby incorporated by reference as if fully set forth herein. The facts in the Complaint Affidavit, and additional facts set forth in this affidavit, come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that SCHURKO committed a violation of 18 U.S.C. § 1951 at or around 8:00 p.m. on December 12, 2021. There is also probable cause to search the information described in Attachment A for evidence of this crime as further described in Attachment B.

## PROBABLE CAUSE

5. The Complaint Affidavit describes the robbery of the Harvard Market at approximately 8:00 p.m. on December 12, 2021 and, as part of the probable cause showing that SCHURKO committed the robbery, provides probable cause to believe that SCHURKO used a GMC Yukon to drive from the AC Hotel in Medford, where he was a registered guest, to a location near the Harvard Market, and then used the GMC Yukon to drive back to the AC Hotel

after committing the robbery. Surveillance video of the AC Hotel parking lot shows that SCHURKO got into the GMC Yukon and left the parking lot at approximately 7:30 p.m., and that he returned to the parking lot at approximately 8:15 p.m. We arrested SCHURKO on the afternoon of December 16, 2021, after he had checked out of the AC Hotel and was about to enter the GMC Yukon. When we arrested SCHURKO he had a cell phone on his person. There is probable cause to believe this is the SUBJECT PHONE, both because a database available to law enforcement indicates that SCHURKO is the subscriber for the SUBJECT PHONE and because SCHURKO has provided the call number for the SUBJECT PHONE as his phone number to FBI Special Agents in the recent past, including Special Agent Kristin Koch, who, as related in the Complaint Affidavit, has had recent contact with SCHURKO. Based on the information set forth below, there is probable cause to believe that records regarding the SUBJECT PHONE, including in particular location information, will show the defendant's whereabouts at and around the time of the robbery and therefore constitute evidence of the robbery.

6. Based on my training and experience, I know that people who have cell phones commonly carry their cell phones with them. Through my experience as a member of the FBI VCTF, I know this to be true in particular of people who commit robberies.

7. Information in the following paragraphs is based on my training and experience and my contacts with other members of law enforcement, including FBI Special Agents who have an expertise in cell phones, wireless providers, how cell phones interact with cell towers, and what types of records wireless providers keep regarding such interactions.

8. Verizon is a company that provides cellular telephone access to the general public. Providers of cellular telephone service have technical capabilities that allow them to

collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

9. Verizon can collect cell-site data about the SUBJECT PHONE. Wireless providers such as Verizon typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. A preservation for such records for the SUBJECT PHONE was served on Verizon on December 14, 2021.

10. Verizon also collects per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

11. Wireless providers such as Verizon typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such

as credit card account number) provided by the subscriber to pay for wireless telephone service. Providers such as Verizon typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  This information may constitute evidence of the crime under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators.

## AUTHORIZATION REQUEST

12. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

13. I further request that the Court direct Verizon to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on Verizon, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

14. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that will seek to determine whether others were involved in the robbery and will seek further evidence regarding the SUBJECT PHONE.

15. Accordingly, there is good cause to seal these documents.

Respectfully submitted,

/s/ John Oliveira

John Oliveira
FBI Task Force Officer

Sworn to by telephone in accordance with Fed. Rule Crim. P. 4.1 this 20th day of December, 2021.

_____
HON. M. PAGE KELLEY
CHIEF UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT
for the
District of Massachusetts

| United States of America | ) |
|---|---|
| v. | ) |
| JOHN SCHURKO | ) Case No. |
| | ) 21-MJ-6767-MPK |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of December 12, 2021 in the county of Middlesex in the
District of Massachusetts, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1951 | in that the defendant did obstruct, delay, and affect commerce and the movement of any article or commodity in commerce by robbery. |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

/s/ John Oliveira
*Complainant's signature*

John Oliveira, FBI Task Force Officer
*Printed name and title*

Sworn to by telephone.

Date: 12/16/2021

*Page Kelley*
*Judge's signature*

City and state: Boston, Massachusetts   Hon. M. Page Kelley, Chief U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR COMPLAINT

I, John Oliveira, depose and state as follows:

### INTRODUCTION AND BACKGROUND

1. I am a Police Officer with the Somerville Police Department and have been so employed since 1997. In 2000, I was assigned to the Detective Bureau of the Somerville Police Department. In June 2008, I was assigned to the FBI Boston Division's Violent Crimes Task Force ("VCTF"), which comprises law enforcement officers from the FBI, Massachusetts State Police ("MSP"), and other local police departments. I have been sworn in as a Special Deputy U.S. Marshal. As a member of the VCTF, I am responsible for investigating kidnappings, murders, robberies, extortion, and other violent crimes. My investigations have included the use of surveillance techniques and the execution of search, seizure, and arrest warrants.

2. I make this affidavit in support of an application for a complaint charging JOHN SCHURKO, YOB 1965 ("SCHURKO"), with affecting commerce by robbery, in violation of 18 U.S.C. § 1951.

### SUMMARY OF FACTS

3. On December 12, 2021, at approximately 8:00 p.m., a white male robbed the Harvard Market (the "Market") located at 229 Highland Avenue in Malden, Massachusetts. The Market is a convenience store that purchases some of the items it sells from outside of Massachusetts.

4. A report by the Malden Police Department ("Malden PD") includes, in part, the following information. At around 8:11 p.m. officers went to the Market in response to a report of an armed robbery. An officer spoke to the victim clerk who said that someone

had robbed the store and left. The victim told the police, among other things, that a white male who was about 5'10" and was wearing a black jacket and a ski mask entered the store. The robber pointed a gun at him and then went behind the counter and asked the victim to give him all the money. The victim gave the robber the money in the register and the robber asked the victim to open the three wooden boxes where money is also kept. The victim opened the boxes and gave the robber that money. The robber then asked the victim for the money in the safe and counted to three, telling the victim that if he did not open the safe the robber would shoot him. The victim told the robber he did not have access to the safe but would give him some money he had in his wallet. The victim knelt and begged the robber not to kill him. The robber went back around the counter. The victim offered the robber money he had in his wallet but the robber said he did not want the victim's money. The robber put the money from the register and wooden boxes in his pocket and left the store. The victim estimated that the robber took approximately $3,000.

5. A Malden PD officer also watched surveillance video of the robbery. In addition to describing the robbery as shown in the video, the officer described in a report what he believed the video depicted regarding the robber's appearance: a male, approximately 5"10", who was wearing a blue hat, a black 3/4 zip jacket with a white logo on the chest area, black gloves, a black ski mask, blue jeans, and black and white sneakers. The officer described the weapon as a black handgun, which the robber took out of his left pocket.

6. On Monday, December 13, 2021, at approximately 10:00 a.m., I spoke with the victim. The victim told me, in substance and among other things, that he was working behind the

cash register when a white male entered the store, immediately brandished a firearm, walked behind the counter and ordered him to give him all of his money. The victim stated that the robber was not a young person and estimated him to be between 45-55 years old. The victim told me that the robber was approximately 5'10" to 6' tall but that he couldn't be sure because he was extremely nervous. The victim also told me, among other things, that the robber took the cash the victim gave him and put it in various pockets, including a rear pants pocket. The victim assisted me in viewing surveillance video of the robbery and provided me with several short clips of the Market's surveillance video. I have seen video of the robber leaving the store with what appears to be cash protruding from his left rear pants pocket, and video from the street showing the same.

7. At this point, I, along with VCTF members MSP Trooper Michael Haines and Malden Detective Robert DiSalvatore, began canvassing the area for additional surveillance video. Task Force members were able to retrieve surveillance video from the Mystic Valley Regional Charter School located directly across the street from the Market, a residential home located on Emerald Street, and a second residential home at the corner of Emerald and Richard Streets. (If one turns left after leaving the Market, the first street one gets to that intersects with Highland Avenue is Emerald Street. If one turns right at that intersection, the first intersection one reaches is Richard Street and Emerald Street.) After reviewing surveillance video, investigators were able to identify the vehicle the suspect used following the robbery: an older model, white, large SUV, which appeared possibly to be a Chevrolet Denali or Cadillac Escalade. A review of surveillance video from shortly before the robbery during the time leading up to the

robbery showed this vehicle circling the area on multiple occasions. The vehicle then parked at the corner of Richard and Emerald Streets until the time of the robbery. The robber returned to this vehicle after the robbery and left the area.

8. We were not able to accurately identify the SUV or get a plate number. During the early morning and into the afternoon of December 14, 2021, VCTF members conducted multiple checks of hotels and motels located in Woburn, Everett, Revere, and Saugus in an attempt to locate a vehicle consistent with the SUV that was used in the robbery. Information was relayed to other Task Force officers who conducted additional hotel checks in the area of Medford, Somerville, Everett, Woburn, Malden, and Saugus. As a result of these hotel checks, a white 2005 GMC Yukon bearing MA registration 3FBH19 (the "Yukon"), was observed in the parking lot of the AC Hilton Hotel, located at 95 Station Landing in Medford. The vehicle is registered to a woman at an address in Billerica, MA.

9. SCHURKO was a suspect in three other robberies that we were investigating. Task Force members made contact with hotel management and, among other things, asked whether SCHURKO was staying there. Hotel personnel told the investigators that SCHURKO had been staying there since December 6, 2021, and was using a credit card to pay for his room.

10. The Medford Police Department has access to the exterior surveillance cameras and associated surveillance video for Station Landing. Members of the Malden PD checked the cameras for December 12, 2021, starting at 7:00 p.m. Video shows that the Yukon was backed into the parking spots opposite the side entrance door to the hotel. At approximately 7:35 p.m. a white male wearing what appeared to be a black 3/4 zip

pullover, a black neck gaiter pulled down around his neck area, blue jeans, black sneakers with white soles and out soles, and a white baseball cap walked from the hotel and entered the driver's side of the Yukon. The clothing is consistent with that worn by the robber, except that the robber wore a blue bucket hat rather than a baseball cap and was wearing gloves. In addition, the robber had a black neck gaiter covering most of his face while the neck gaiter on the man who entered the Yukon was pulled down around the man's neck. After the man entered the Yukon it travelled on Station Landing, turning left onto Earhart Landing. It then travelled through Wellington Circle onto Middlesex Avenue in Medford. Middlesex Avenue in Medford becomes Highland Avenue when it crosses into Malden. The Market is located on Highland Avenue in Malden.

11. I have viewed the video of the man entering the Yukon as described above. I am familiar with the appearance of SCHURKO and believe this man was SCHURKO.

12. The members of the Malden PD continued to watch the video of the hotel parking lot and observed that the Yukon returned to the hotel parking lot at about 8:15 p.m. The white male that exited the Yukon appeared to be wearing the same clothing as when he got into it earlier: a white baseball cap, blue jeans, a black 3/4zip pullover, and black sneakers with white soles and out soles. Because the pullover was zipped up at this point any neck gaiter he was wearing is not visible. The two additions are that, like the Market robber, he was now wearing black gloves. Also like the robber, the man who got out of the car had protruding from his left rear pants pocket an item or items consistent with cash. He then walked toward the hotel and entered through the side door. This male can then be seen on video walking up the staircase that faces Station Landing, appearing to exit the stairwell onto the third floor.

13. Again, I believe the man depicted in the hotel parking lot video is SCHURKO. I am familiar with the area in which the Hotel and the Market are located. I know that one can drive from the hotel to the Market, or from the Market to the hotel, within approximately five minutes during periods of normal traffic. The third floor of the hotel is where the room SCHURKO was staying is located.

14. Investigators have also viewed surveillance video from inside the hotel. We have seen numerous images of SCHURKO inside the hotel.

15. In addition, I learned today that an FBI Special Agent, Kristin Koch, happened to have met with SCHURKO on an unrelated matter on December 8, 2021. SCHURKO was wearing, among other things, blue jeans and a black neck gaiter pulled up over his nose when he came out of the hotel. . Special Agent Koch has viewed video of the robber and is 95% sure that it is SCHURKO given that the robber appears to be wearing the same jeans SCHURKO was wearing on December 8, appears to be wearing the same neck gaiter, was walking in a manner consistent with the way Special Agent Koch has seen SCHURKO walk, and the portion of the face that was visible above the gaiter appears to be the same as the portion of the face Special Agent Kock could see when she saw SCHURKO on December 8. Special Agent Koch has also reviewed video of the man leaving and returning to the hotel parking lot in the Yukon and is certain that it is SCHURKO.

16. SCHURKO checked out of the hotel yesterday. We were conducting surveillance. As SCHURKO approached the Yukon with a grey duffle bag and a white trash bag, he was placed under arrest. We have since executed a search warrant with respect to the Yukon and property that was immediately adjacent to the Yukon when we arrested SCHURKO.

Among other things, we recovered blue jeans consistent with those worn by the robber in Malden, black gloves, a black neck gaiter, and a black Airsoft handgun that appears consistent with the weapon shown during the Malden robbery. SCHURKO was also wearing sneakers consistent with those worn during the robbery. We did not recover the ¾ zip jacket, but that jacket has a unique logo on it, and we recovered a T-shirt with the same logo. We believe the logo is that of a union for which SCHURKO's girlfriend works.

17. Based on the foregoing, there is probable cause to believe that SCHURKO robbed the Market on December 12, 2021, and thereby affected commerce by robbery, in violation of 18 U.S.C. § 1951.

/s/ John Oliveira
_____
John Oliveira
FBI Task Force Officer

Attested to by telephone this 16th day of December, 2021.

_____
Hon. M. Page Kelley
Chief U.S. Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number 617-352-9469, that are stored at premises controlled by Verizon Wireless, a cellular service provider headquartered at 180 Washington Valley Road, Bedminster, NJ 07921 (the "Provider").

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period **between 7:00 p.m. EST and 9:00 p.m. EST on December 12, 2021.**

    a. The following information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

      viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

      i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

      ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received as well as per-call measurement data (also known as the "real-time tool" or "RTT" data).

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of a violation of 18 U.S.C. § 1951 involving John Schurko during the period **between 7:00 p.m. EST and 9:00 p.m. EST on December 12, 2021.**